ELLENE Z. ROSENSTEEL, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 101995, 102483, 102484, 102676, 102677, 102822, 102823, 103566, 103567, 103568, 103988.
Promulgated May 20, 1942.

*W. A. Seifert, Esq., Norman D. Keller, Esq.,* and *A. G. Wallerstedt, C. P. A.,* for the petitioners.
*Orris Bennet, Esq.,* for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Catherine W. Suppes; Estate of Samuel B. Waters, deceased, Catherine Suppes, Executrix; Mary Ellis Turner; Hilda Ellis Mayer; Estate of Emma J. Howard, deceased, Charles F. Hager, Administrator c. t. a.; Frank Howard; Alice W. Thomas; Robert S. Waters; Elizabeth W. Waterman; and Charles W. Kunkle and Maude B. Kunkle, husband and wife.

1190

**OPINION.**

VAN FOSSAN: The first issue presents the question whether or not the redemption of the petitioners' preferred stock in the Water Corporation on November 20, 1936, constituted a partial liquidation taxable under section 115 (c) of the Revenue Act of 1936.[2]

The petitioners assert and attempt to show that the entire procedure, starting with the resolution of the board of directors of the Water Corporation on September 18, 1936, to redeem the outstanding $100 par value 6 percent cumulative preferred stock of the corporation on November 20, 1936, and ending with the issue on December 31, 1936, of 19,980 of its new noncumulative no par value preferred stock to Bethlehem, was one entire unified plan whose purpose was to

---

[2] SEC. 115.  DISTRIBUTIONS BY CORPORATIONS.

\*        \*        \*        \*        \*        \*        \*

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock.  The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112.  Despite the provisions of section 117 (a), 100 per centum of the gain so recognized shall be taken into account in computing net income, except in the case of amounts distributed in complete liquidation of a corporation.  For the purpose of the preceding sentence, "complete liquidation" includes any one of a series of distributions made by a corporation in complete cancellation or redemption of all of its stock in accordance with a bona fide plan of liquidation and under which the transfer of the property under the liquidation is to be completed within a time specified in the plan, not exceeding two years from the close of the taxable year during which is made the first of the series of distributions under the plan.  In the case of amounts distributed (whether before January 1, 1934, or on or after such date) in partial liquidation (other than a distribution within the provisions of subsection (h) of this section of stock or securities in connection with a reorganization) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits.

purchase the old preferred stock and to "resell" to Bethlehem the preferred interest in the corporation in the form of a somewhat similar stock, with no concomitant intent to distribute in complete cancellation or redemption of a part of the Water Corporation stock.

The petitioners argue that "as a whole" the transaction took nothing from the Water Corporation and transferred none of the corporate assets to its stockholders. They recite that before the redemption of the petitioners' 6 percent cumulative preferred stock the Water Corporation had outstanding 18,040 shares of such stock, while after the issuance of the 6 percent noncumulative preferred stock the corporation had outstanding 19,980 shares of the latter stock, a substitute "with some change in the character of the interest", and assert also that the net worth of the Water Corporation was increased by this maneuver.

The respondent contends that the Water Corporation intended to redeem the preferred stock of the petitioners and others as a complete integral action, and sets forth the following evidentiary facts:

On September 19, 1936, the Water Corporation sent to the preferred stockholders its notice of redemption. On November 20, 1936, the corporation redeemed a portion of the stock in cash and completed the redemption by December 15, 1936. On December 15, 1936, the corporation filed a certificate of redemption with the Secretary of State of Delaware, stating that the certificate was filed so that its capital might be deemed to be reduced by the face value of the redeemed stock, or $1,804,000, pursuant to the requirement of the law of Delaware. On December 17, 1936, the Water Corporation stockholders adopted a resolution altering its structure by eliminating therefrom the authorized issue of 6 percent cumulative preferred stock at $100 a share and permitting the issue of noncumulative preferred stock of no par value carrying dividends of $6 per share. On December 21, 1936, a corresponding certificate of amendment was filed with the Secretary of State of Delaware. The corporation made appropriate entries on its books indicating the retirement of the stock. Each petitioner received $105 per share, the redemption price specified in the charter. The 19,980 shares of the new stock were issued to Bethlehem on December 31, 1936.

The respondent maintains that from an analysis of this record, the shift of the parties in interest, and the wide variance in the character of the preferred stocks, the indubitable conclusion must be drawn that the redemption of the petitioners' preferred stock was a wholly separate transaction from the issuance of the new preferred stock to Bethlehem.

The respondent has overlooked one fact contained in the record which strongly supports his position. Robert E. McMath (vice

president of Bethlehem and president of the Water Corporation), under whose supervision the transactions described were accomplished, testified that the Water Corporation borrowed from Bethlehem the funds needed to redeem the old stock; that the loan and other indebtedness of the Water Corporation to Bethlehem were discharged by an issue of a new class of preferred stock at the end of 1936, and that the plan for the redemption by the issuance of the preferred stock originated "shortly after the old stock was called for redemption and sometime before November 14, 1936."

This bit of testimony clarifies the facts and clearly leads to the conclusion that the creation of the new stock and its issuance to Bethlehem and the redemption of the petitioners' preferred stock were not parts of a single integrated plan, but were separate transactions. The procedure of redemption pursued precisely its original and independent course, which terminated in the filing of the required certificate with the Secretary of State of Delaware, stating that the Water Corporation had redeemed all of its outstanding 6 percent cumulative preferred stock at its authorized redemption price and that the certificate was made "in order that * * * the capital * * * shall be deemed to be and shall thereby be reduced by the amount of the capital of the Corporation so applied to the aforesaid redemption of said 18,040 shares of said Six Per Cent Cumulative Stock to wit, $1,804,000.00."

Although the stock could have been reissued, the purport of the certificate was that a reduction of capital and not a reissuance of the stock was contemplated by means of the process of redemption. Moreover, reissuance was effectively barred by the subsequent amendment to the certificate of incorporation.

We have no doubt, on the facts and in the light of decided cases, that the redemption of the 6 percent cumulative preferred stock by the Water Corporation constituted a partial liquidation within the purview of section 115 (c) and as defined by section 115 (i). See *Helvering* v. *Tex-Penn Oil Co.*, 300 U. S. 481; *Cohen Trust* v. *Commissioner*, 121 Fed. (2d) 689; *L. B. Coley*, 45 B. T. A. 405.

The later issuance of the 6 percent noncumulative preferred stock was accomplished by a separate and independent series of actions and events. The expedient was adopted to protect the equity of Cambria, holder of the common stock, against the potential pressure of Bethlehem's claims as a common creditor and became the more imperative after the Water Corporation had borrowed almost two million dollars from Bethlehem to pay for the redeemed stock of the petitioners and others.

Furthermore, the authorization and the issuance of the new stock were begun after the redemption of the old stock and the proper certification thereof were completed. There was no overlapping such

as normally would have occurred if both transactions had been component parts of a single plan. This sharp separation of record and procedure is additionally persuasive that there was no definite unified plan to substitute the new 6 percent noncumulative preferred stock for the old 6 percent cumulative preferred stock. See *United States* v. *Rodgers*, 102 Fed. (2d) 335. On the issue here involved we sustain the respondent.

In the second issue we must determine whether or not the exchange of common stock in the Water Co. for common and preferred stock of the Water Corporation was a taxable transaction.

The petitioners concede that under a strictly literal interpretation of the pertinent statutory provisions (sec. 112 (b) (3) and (i), Revenue Act of 1928 [3]) the exchange was nontaxable, but argue that the transferor of stock must retain a proprietary interest in the enterprise in order to meet the requirements of the statute, citing *Le Tulle* v. *Scofield*, 308 U. S. 415. They assert that the preferred stock which they received in the transaction represented no such interest.

In the *Le Tulle* case the Supreme Court said:

* * * Where the consideration is wholly in the transferee's bonds, or part cash and part such bonds, we think it cannot be said that the transferor retains any proprietary interest in the enterprise. On the contrary, he becomes a creditor of the transferee; and we do not think that the fact referred to by the Circuit Court of Appeals, that the bonds were secured solely by the assets transferred and that, upon default, the bondholder would retake only the property sold, changes his status from that of a creditor to one having a proprietary stake, within the purview of the statute.

Thus the Court distinguished between the character of a bond and that of preferred stock. The petitioners were either stockholders and as such the owners of a proprietary interest in the enter-

---

[3] SEC. 112.  RECOGNITION OF GAIN OR LOSS.

 *  *  *  *  *  *  *

(b) EXCHANGES SOLELY IN KIND.—

 *  *  *  *  *  *  *

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

 *  *  *  *  *  *  *

(i) DEFINITION OF REORGANIZATION.—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

prise (the Water Corporation), or were its creditors. In Black's Law Dictionary, p. 1449, the word "proprietary" is defined as "relating or pertaining to ownership, belonging or pertaining to a single individual owner." The right of management is only one of the powers incident to ownership and that power may be waived or delegated. Restrictions, voluntary or otherwise, of ownership do not change the inherent character of the right. A creditor is defined as a person to whom a debt is owing by another person, called a debtor. Black's Law Dictionary, p. 476.

Petitioners possessed no debt due *from* or claim *against* the Water Corporation. They owned an interest *in* the corporation. They could not proceed against it to recover their investment in the preferred stock so long as none of their specified rights were violated, but the creditors could enforce their claims in the customary legal manner.

The distinction between a creditor and a stockholder of a corporation is too clearly defined to merit much discussion. The status of a holder of preferred stock, as compared with that of the owner of common stock, is set forth in Fletcher Encyclopedia of Corporations, Permanent Ed., vol. II, sec. 5290, as follows:

> In the absence of special provisions, the holders of preferred stock in a corporation are in precisely the same position, both with respect to the corporation itself and with respect to creditors of the corporation, as the holders of common stock, except only that they are entitled to receive dividends on their shares, to the extent guaranteed or agreed upon, before any dividends can be paid to the holders of common stock.

In *Hazel Atlas Glass Co.* v. *Van Dyk & Reeves, Inc.*, 8 Fed. (2d) 716, the court said:

> The general rule is that a holder of preferred stock, even though the preferred dividend is guaranteed, is not regarded as a creditor of the corporation, and entitled as such to share with the other creditors in the distribution of the assets. He is, like the holders of the common stock, merely a stockholder, but with this difference, that he is entitled to priority of payment out of the assets which remain after all debts are paid; the holders of the common stock sharing in such assets as are left.

In the case at bar the petitioners had all the rights usually reserved to preferred stockholders but lacked only the right to vote. For the purposes of section 112 we believe that the absence of this privilege is immaterial to the issue. It certainly can not convert a stockholder into a creditor.

The cases cited by both the petitioners and the respondent are useful only in an analogical discussion in which we deem it unnecessary to indulge. We hold that the exchange of the Water Co. stock in 1928 for the Water Corporation stock constituted a nontaxable transaction within the meaning of section 112 (b) (3) and (i) and that, consequently, the basis of gain or loss to the petitioners upon

the redemption of their Water Corporation stock in 1936 was the cost of the Water Co. stock to them.

In view of our decision in the second issue the question presented in the third issue becomes moot.

The fourth issue involves the propriety of including the G. C. Murphy stock in the distribution of the Hillcrest Foundation, Inc., to petitioners Alice W. Thomas, Robert S. Waters, and Elizabeth W. Waterman in 1936 and 1937. The circumstances surrounding the transfer of the stock are fully set forth in the findings of fact and need not be repeated.

Both the petitioners and the respondent cite and rely on *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417. In that case the Court said:

* * * If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.

We think the principles so announced apply to the facts before us. Certain individuals acquired the G. C. Murphy Co. stock by inheritance in 1933 from the estate of John H. Waters, who, prior to his death, claimed to have acquired it by purchase in 1931. The stock was contributed as capital to the Hillcrest Foundation, Inc., in 1934 and the shares, increased by a stock split-up, were distributed to the petitioners in 1936; all under the same "claim of right" and "without restriction as to disposition." At that time no litigation was pending. There is no element of trusteeship or agency in the situation that would exclude the gain from the petitioners' own income tax liability. See *Stoner* v. *Commissioner*, 79 Fed. (2d) 75; *Commissioner* v. *Trinidad Paving Co.*, 62 Fed. (2d) 85; *Commissioner* v. *Turney*, 82 Fed. (2d) 661. The deferment of taxation, pending the final outcome of litigation, later initiated, would distort the taxation of current income within the intendment of the tax statutes.

Therefore, the distribution of the G. C. Murphy Co. stock must be taken into account in determining the gain to the petitioners arising from the distributions made by the Hillcrest Foundation, Inc., during the years 1936 and 1937.

The fifth issue requires us to determine whether the stock of the Century Co. became worthless in 1936 or at some time before that year. Century was incorporated in 1902. The record does not show what degree of prosperity it enjoyed for the ensuing 32 years, but in 1934 it obtained a loan of $30,000 from the Reconstruction Finance Corporation. Apparently at that time its business prospects were considered fairly good. In June 1935 a receiver was appointed for the company. The balance sheet of June 5, 1935, reflects the un-

satisfactory condition of the enterprise. In August 1935 a plan of reorganization was proposed whereby the claims of creditors would be adjusted by a cash and stock settlement. In October 1935 a petition to convene creditors was filed. On December 2, 1935, one of the plaintiffs in the receivership proceeding reported that the business showed some improvement and requested a continuance of the receivership for three months. The court thereupon granted the request.

In the meantime the Reconstruction Finance Corporation had taken steps to perfect its preferred rights by seeking a confessed judgment and the authority to foreclose. The affairs of Century remained in suspension until January 21, 1936, when its property securing the Reconstruction Finance Corporation obligation was levied on. On February 15, 1936, the property was sold to the Reconstruction Finance Corporation for a nominal sum. On January 30, 1936, the receiver requested authority to sell Century's remaining assets and on February 18, 1936, sold them for $4,750.

From this review of the essential facts we see that as late as December 2, 1935, a plaintiff in the receivership action declared to the court that Century's business was improving and asked that the receivership be continued. Obviously, at that time there was no indication that the stock was worthless even though the Reconstruction Finance Corporation had obtained an absolute rule to foreclose. The establishment and continuation of the receivership does not impute worthlessness. *Edward C. Lawson*, 42 B. T. A. 1103. Until sale there always was a chance to complete the reorganization plan and to satisfy the Reconstruction Finance Corporation's demands. Even at that sale the stockholders and creditors might have paid for the buildings and equipment enough to pay off or curtail the Reconstruction Finance Corporation loan and so to continue Century's business operations.

Of course, the sale to the Reconstruction Finance Corporation at $25 merely indicates that no one was willing to pay for the mortgaged property more than the debt against it. Consequently, the forced sale of Century's remaining assets did not measure their real worth to a going concern.

From all the facts here presented we conclude that the petitioners' stock in Century had some potential value in 1935 and that such value was not extinguished until 1936. *Sterling Morton*, 38 B. T. A. 1270, affd., 112 Fed. (2d) 320.

In the sixth issue the respondent asserts that petitioner Robert S. Waters is estopped from alleging that his Century stock was worthless in 1936. In an amendment to his answer the respondent raised this issue on the ground that the petitioner claimed a deduction in his income tax return for the year 1936 based on the worthlessness of his Century stock; that the respondent disallowed the deduction on the

ground that the stock became worthless in 1935; that thereupon the petitioner filed a claim for refund; that his claim was allowed by the respondent; and that the petitioner received and cashed a Treasury check representing that allowance. In his pleadings the respondent does not state that the claim for refund related to the year 1935, but we may assume that to be the situation.

The stipulated facts show that on April 9, 1940, the collector of internal revenue notified the petitioner that he was holding the Treasury check covering the refund. On April 13, 1940, the petitioner, through counsel, notified the collector that the acceptance of the check did not constitute an admission of the correctness of the deduction for the year 1935.

In his brief the respondent does not argue the point, but only cites *Alamo National Bank of San Antonio*, 36 B. T. A. 402; affd., 95 Fed. (2d) 622; certiorari denied, 304 U. S. 577. The purport of that decision is that "honesty, good faith and consistency are due in tax accounting" and that "the right and wrong of things and equitable principles have a place in tax matters."

The decision in the *Alamo* case is neither controlling nor persuasive on the issue before us. Here, the petitioner was not guilty of dishonesty, bad faith, or inconsistency. On the contrary, he claimed that his Century stock became worthless in 1936. The respondent's action prevented the allowance of the deduction for that year. The petitioner then, in conformity with the respondent's determination, filed a claim for refund. The claim was allowed and a check issued therefor, but before accepting it the petitioner reiterated his original position and specifically stated that he did not concede the correctness of the respondent's action.

Under these circumstances we find no grounds on which the respondent can maintain his position on this question. He could not have been misled. If he ultimately should fail to recover the item or its equivalent in income he can blame only himself. The plea of estoppel is rejected.

*Decisions will be entered under Rule 50.*